# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-723


**JOSEPH ADAMS**

**VERSUS**

**GEORGIA GULF LAKE CHARLES, LLC, ET AL.**



\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION – District No. 3
PARISH OF CALCASIEU, NO. 15-03654
DIANNE MAYO, WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*

**CANDYCE G. PERRET
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Billy H. Ezell, John E. Conery, Van H. Kyzar, and Candyce G. Perret, Judges.

**Ezell, J., dissents and assigns written reasons.**


**JUDGMENT AMENDED AND, AS AMENDED, AFFIRMED.**

**Thomas A. Filo**
**Cox, Cox, Filo Camel & Wilson, LLC**
**723 Broad Street**
**Lake Charles, LA 70601**
**(337) 436-6611**
**COUNSEL FOR PLAINTIFF-APPELLEE:**
    **Joseph Adams, Jr.**

**H. Alston Johnson, III**
**Gregory T. Stevens**
**J. Alan Harrell**
**Phelps Dunbar, LLP**
**P. O. Box 4412**
**Baton Rouge, LA 70821-4412**
**(225) 346-0285**
**COUNSEL FOR DEFENDANTS-APPELLANTS:**
    **Liberty Mutual Insurance Co.**
    **Georgia Gulf Lake Charles, LLC**

**PERRET, Judge.**

This is a workers' compensation claim for indemnity benefits based on an alleged occupational hearing loss. Georgia Gulf Lake Charles, LLC and its insurer, Liberty Mutual Insurance Company (hereinafter collectively referred to as "Georgia Gulf"), appeal the decision of the workers' compensation judge ("WCJ") awarding Joseph Adams supplemental earnings benefits ("SEB"), penalties, and attorney fees for hearing loss caused by his employment. Mr. Adams answered the appeal seeking additional attorney fees for work done on the appeal. For the following reasons, we amend the judgment to limit Mr. Adams' SEB payments to 104 weeks, and affirm as amended. Additionally, we render an attorney fee award of $5,000.00 in favor of Mr. Adams and against Georgia Gulf Lake Charles, LLC and Liberty Mutual Insurance Company, jointly, severally and in solido, for work done on this appeal.

**FACTS:**

Mr. Adams was employed for forty years by Georgia Gulf from February of 1971 until his retirement in January of 2011. While employed at Georgia Gulf's facility, Mr. Adams worked as a Construction Worker, Boilermaker, and Crane Operator. Mr. Adams claims he began to notice some degree of hearing loss in his left ear in the mid-1980s and in his right ear in 1997. Mr. Adams testified that he believes his left ear experienced hearing loss much more than his right ear because he would often remove his left earplug an average of five or six times a day in order to communicate with his co-workers in the plant environment.

In January 2010, Mr. Adams had back surgery. Although Mr. Adams testified that he had planned to work at Georgia Gulf until the age of seventy, he chose to retire in January of 2011, at the age of sixty-five, after being informed by Georgia Gulf that it was retiring him. In his supplemental appellee brief, Mr.

2

Adams concedes that "the record does establish that Mr. Adams has not sought employment since his retirement from Georgia Gulf and that he now considers himself retired."

In December 2011, Mr. Adams filed a tort claim alleging occupational noise-induced hearing loss as a result of his employment with Georgia Gulf. In 2015, the Louisiana Supreme Court held, in *Arrant v. Graphic Packing International, Inc.*, 13-2878, 13-2981 (La. 5/15/15) 169 So.3d 296, that occupational noise-induced hearing loss is an occupational disease under the Louisiana Workers' Compensation Act ("LWCA"). Thereafter, on June 12, 2015, Mr. Adams filed the current workers' compensation claim, seeking SEB as a result of his alleged occupational hearing loss.

A bench trial was held on February 7-8, 2017. On May 9, 2017, the WCJ signed a judgment finding that Mr. Adams established entitlement to workers' compensation medical and indemnity benefits due to occupational hearing loss; Mr. Adams is entitled to SEB at the maximum compensation rate of $579 per week from January 1, 2011, with interest; Georgia Gulf shall continue to pay this rate until it either finds or offers a job to Mr. Adams paying at least ninety percent of his average weekly wage; said job must be within the restrictions placed on Mr. Adams by Dr. Donna Breen ("Dr. Breen"); Mr. Adams was entitled to a penalty of $8,000.00 and attorney fees of $25,000.00 for Georgia Gulf's failure to investigate the claim and the arbitrary and capricious handling of the claim; and ordered Georgia Gulf to pay medical benefits as needed by Mr. Adams.

On appeal, Georgia Gulf asserts the following four assignments of error: (1) the WCJ erred in determining that Mr. Adams' claim had not prescribed; (2) the WCJ erred in concluding that Mr. Adams established a causal connection between his hearing loss and employment at Georgia Gulf, and the corresponding

3

entitlement to medical and indemnity benefits; (3) the WCJ erred in determining that Mr. Adams was entitled to SEB; and (4) the WCJ erred in awarding penalties and attorney fees. Mr. Adams answered Georgia Gulf's appeal, seeking additional attorney fees for work done on this appeal.

**STANDARD OF REVIEW:**

Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. *Banks v. Indus. Roofing Sheet Metal Works, Inc*., 96-2840 (La. 7/1/97), 696 So.2d 551. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. *Id*. As the Louisiana Supreme Court stated in *Stobart v. State, Through Department of Transportation & Development*, 617 So.2d 880, 882 (La.1993) (internal citations and quotation marks omitted):

> [T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Nonetheless, this Court has emphasized that the reviewing court must always keep in mind that if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

**DISCUSSION:**

*Prescription*

The first issue to address is whether the WCJ correctly determined that Mr. Adams' workers' compensation claim had not prescribed. Georgia Gulf argues that Mr. Adams was clearly aware that he had occupational hearing loss as early as the 1990s but did not file his tort suit until 2011. Thus, Georgia Gulf alleges that Mr. Adams' workers' compensation claim prescribed because his untimely tort suit cannot toll the prescriptive period.

Conversely, Mr. Adams argues that there are special prescription rules for an occupational illness under La.R.S. 23:1031.1(E), which states that a claim must be filed "within one year of the dates that: (1) [t]he disease manifested itself[,] (2) [t]he employee is disabled from working as a result of the disease[,] [and] (3) [t]he employee knows or has reasonable grounds to believe that the disease is occupationally related." Accordingly, Mr. Adams alleges that because his employment with Georgia Gulf did not terminate until January 1, 2011, his claim could not have prescribed given that his tort suit was filed in December 2011, and it was pending at the time of the instant workers' compensation claim. We agree.

Louisiana Civil Code Article 3462 provides that prescription is interrupted "when the obligee commences action against the obligor, in a court of competent jurisdiction and venue." The "interruption of prescription resulting from the filing of suit in a competent court and in the proper venue or from service of process within the prescriptive period continues as long as the suit is pending." La.Civ.Code art. 3463. Louisiana jurisprudence holds that where a tort suit was filed prior to the workers' compensation claim, courts have found that the employee's filing of a tort suit against his employer interrupted prescription as to a subsequently-filed workers' compensation claim by the employee against the

5

employer. *Bruce v. Becnel*, 98-1349 (La.App. 5 Cir. 10/13/99), 747 So.2d 647, *writ denied*, 99-3250 (La. 1/28/00), 753 So.2d 830; *Cryer v. Tenneco Oil Co.*, 615 So.2d 1070, (La.App. 4 Cir. 1993); *Burrier v. Malmac Energy Corp.*, 592 So.2d 1370, (La.App. 2 Cir. 1992).

In this case, Mr. Adams' tort suit against Georgia Gulf was filed in a court of competent jurisdiction and proper venue within one year of his termination of employment. In the petition, Mr. Adams alleged occupational induced hearing loss. Thus, both the tort claim and workers' compensation claim against Georgia Gulf were based on the same illness, which was Mr. Adams' occupational noise-induced hearing loss. For these reasons, we find no error in the WCJ's factual conclusion that the timely-filed tort action interrupted prescription as to Mr. Adams' subsequent workers' compensation claim against Georgia Gulf.

*Causation*

The second issue to address is whether the WCJ properly determined that Mr. Adams met his burden of proving that he suffered hearing loss as a result of the noise levels associated with his employment at Georgia Gulf. Georgia Gulf contends Mr. Adams has age-induced hearing loss, whereas Mr. Adams alleges that he has an occupationally induced hearing loss as a result of his employment with Georgia Gulf for over forty years.

Louisiana Revised Statutes 23:1031.1 governs workers' compensation claims for an occupational disease and defines an occupational disease as a "disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease." "A plaintiff bears the burden of proving, by a preponderance of the evidence, that the disease at issue was contracted during the course of her employment and that the disease was the result of the nature of the

6

work performed." *Mitchell v. All Compressors*, 05-1186, p. 4 (La.App. 3 Cir. 4/5/06), 926 So.2d 127, 131-32. As stated in *Comeaux v. Star Enterprise/Motiva Enterprise*, 02-24, p. 8 (La.App. 1 Cir. 12/20/02), 836 So.2d 359, 364 (citations omitted):

> The causal link between his illness and work-related duties must be established by a reasonable probability. The claimant will fail if he shows only a possibility that the employment caused the disease, or that other causes not related to the employment are just as likely to have caused the disease.

The record contains the testimony of four expert witnesses on this issue: Dr. Breen, a board certified otolaryngologist; Dr. Robert Dobie, a board certified otolaryngologist; Dr. Steven Madix, board certified in speech pathology and audiology; and Dennis Driscoll, the President of Associates in Acoustics, Inc., a professional consulting firm in noise control and hearing conservation. Plaintiff's expert, Dr. Breen, testified that she first saw Mr. Adams for hearing difficulties on June 21, 2016. At that time, she performed an audiogram that "showed a deeply sloping sensorineural hearing loss, bilateral and symmetric above 2000 Hz. He was [sic] tinnitus matched in both ears for 4000 Hz. This type of precipitous loss in the high frequencies is indicative of acoustic trauma." Dr. Breen testified that "this type of hearing pattern is often seen with noise exposure in an industrial environment" and that Mr. Adams has "objective indications of sensorineural hearing loss due to acoustic trauma and chronic tinnitus as well."

On July 27, 2016, Dr. Breen supplemented her report to include working restrictions based on the results of Mr. Adams' hearing tests. Specifically, the report stated, in pertinent part:

> It is my understanding that this patient was working in the refinery units with high levels of noise exposure from compressors and pumps and other heavy equipment. Based on the results of his audiogram, I would

recommend that the patient work in a less noisy environment such as in an office or warehouse without this high level of noise exposure. It is medically necessary to intervene when presented with high frequency hearing loss of this type by simply changing the environment to a less noisy workplace exposure. In taking these precautions, it would avoid more severe hearing loss.

On October 12, 2016, Dr. Breen disagreed with Georgia Gulf's expert, Dr. Dobie, who attributed Mr. Adams' hearing loss to age-related hearing loss. After reviewing Mr. Adams' older audiograms from 1978 and 1979, a time in which hearing protection was seldom worn, Dr. Breen found that Mr. Adams began having hearing loss at thirty-three years old, which in her opinion, "would mitigate against having age-related hearing loss."

Georgia Gulf's expert, Dr. Madix, provided his professional opinion on Mr. Adams' hearing loss after reviewing Mr. Adams' records. Dr. Madix stated in correspondence dated December 3, 2015, that he found "nothing in those documents that links his [Mr. Adams'] loss to occupational noise exposure." Dr. Madix further stated, as follows:

No hearing test ever indicated a noise notch, he [Mr. Adams] never indicated that he had tinnitus, he reports wearing hearing protection essentially all the time (although I [Dr. Madix] don't know the noise levels he was exposed to), as well as he reports that he has side jobs/hobbies that are noisy. . . .

The only occupational exposure that I see that could be linked to hearing loss is the issue of him not wearing the respirator when around whatever fumes he was exposed to. Some of those industrial solvents have ototoxic side effects that might warrant some additional research. But otherwise, his hearing loss appears to be presbycusic in nature, with the exception of the asymmetry in that left ear, which there doesn't appear to be any reported cause for that.

Dr. Dobie also reviewed Mr. Adams' records and testified that, in his opinion, Mr. Adams has "mild age-related hearing loss." He testified that it would

be medically acceptable for Mr. Adams "to return to his previous job, as long as he continued to use hearing protections as needed and was otherwise compliant with the hearing conservation program." However, Dr. Dobie indicated that his opinions are based only on the information provided to him at that time and that he would appreciate the opportunity to reconsider and revise his opinions should there be additional information.

Georgia Gulf also hired Mr. Driscoll to testify at trial regarding the effects of occupational noise on employees in industrial facilities. Mr. Driscoll testified that the permissible exposure level is 90 decibels and that "when we are over 90, that's when mandatory hearing protection kicks in." Mr. Driscoll testified that Mr. Adams' noise exposure during his tenure at the plant, based on the materials he reviewed, averaged 82.6 decibels without any consideration for wearing hearing protection. When asked whether he believed there were any significant changes to the facility over time that would have considerably changed the noise levels, Mr. Driscoll testified that he didn't "think the levels would have changed significantly over time."

Mr. Adams testified that he first began noticing signs of hearing loss ten to fifteen years before he left Georgia Gulf in 2011, and that his hearing gradually worsened over time. He testified that he did not begin to wear ear protection until the late 1970s when Georgia Gulf first began furnishing ear plugs for noise protection. When asked how often he would be using a jackhammer during those earlier years, Mr. Adams testified that "in the earlier years, we had a - - we had a lot of jackhammer work to do, pouring new concrete. Before we started hiring contractors, well, me and my friends, that's all we done [sic] was use jackhammers, sometimes three times a week, sometimes . . . four times . . . ."

9

The WCJ provided written reasons for judgment for concluding that Mr. Adams had established his entitlement to workers' compensation benefits due to occupational noise induced hearing loss and stated, in pertinent part:

> Dr. Dobie as well as Mr. Driscoll attributes claimant's hearing loss to age, but the cold tests they relied upon did not substantiate the claim. In fact, Mr. Adams had at least three "threshold shifts" (as shown by Georgia Gulf's own audiograms) which means his hearing loss was accelerating at a rate OSHA [Occupational Safety and Health Administration] attributes to noise loss after adjustment for age.
>
> After listening to the testimony of the claimant and the doctors called by the defendants and reviewing the medical evidence, this court believes claimant has proven he suffered an on-the-job work injury of occupationally induced hearing loss. Dr. Breen, the only doctor that saw claimant, administered testing and took oral medical history and clearly found tinnitus which employer's first doctor, Dr. Madix, said was absent, e.g., "He never complained he had tinnitus." The other doctor hired by the defendant who reviewed cold records opined that tinnitus does not mean anything. Therefore, defendant's doctors' opinions conflict, both of whom merely examined the records of the claimant. There is something to be gleaned from actually talking to a claimant that you are going to get as opposed to viewing only cold records. For instance, the fact that claimant was exposed to jackhammers and other high decibel noise for almost ten years before he was even given hearing protection. Further, the claimant had a habit of repeatedly removing his left earplug over the years to converse with his co-workers. All this information was relayed to Dr. Breen who has a complete picture of claimant's over 40 years of work history with defendant/employer and was able to make the determination that she did.

After reviewing the expert witness testimony and the exhibits, we find no error in the WCJ's decision to credit the testimony of Dr. Breen over Georgia Gulf's experts, especially considering the fact that Dr. Breen was the only expert who performed a physical assessment of Mr. Adams. Accordingly, we find no error in the WCJ's finding that Mr. Adams satisfied his burden of proving that his

hearing loss resulted from the noise he was exposed to during his forty year employment with Georgia Gulf.

***Entitlement to SEB***

The third issue to address is whether the WCJ erred in finding that Mr. Adams is entitled to SEB payments at the maximum compensation rate of $579 per week from January 1, 2011, and ordering Georgia Gulf to continue to pay this rate until it either finds or offers a job to Mr. Adams paying at least ninety percent of his average weekly wage. Georgia Gulf cites to *Poissenot v. St. Bernard Parish Sheriff's Office,* 09-2793, (La. 1/9/11); 56 So.3d 170, 175 (emphasis in original) for the statutory standard to be used in determining whether Mr. Adams met his initial burden of proof for SEB:

> La. R.S. 23:1221(3)(a) requires that a claimant prove by a preponderance of the evidence that he is unable to earn ***wages*** equal to ninety percent or more of wages he was earning at the time of injury "***whether or not*** the same or similar occupation as that in which the employee was customarily engaged when injured." (Emphasis added). The statute clearly places its focus on the amount of wages earned before and after the accident, not the type of occupation or the type of work performed. In reviewing the lower courts' judgments, we will examine ***all*** the evidence that bears upon the employee's inability to earn 90% or more of his pre-injury wages to determine whether Poissenot [claimant] met his initial burden.

Georgia Gulf argues that Mr. Adams is not entitled to SEB regardless of the cause of his hearing loss because he failed to prove any "economic" disability. It alleges that Mr. Adams made no attempt to find other employment or failed to prove that he could not earn more than ninety percent of his pre-accident wages since 2011, and that any claim for SEB was extinguished when he retired in January of 2011, at age sixty-five.

11

Although Mr. Adams agrees with Georgia Gulf that the *Poissenot* Court stressed that the focus under the statute is on whether a claimant has shown inability to earn ninety percent of his pre-injury wages, Mr. Adams argues that *Poissenot* did not involve, and the Court did not discuss, an occupational illness or disease such as in this case. Thus, Mr. Adams cites to the Louisiana Supreme Court case, *Seal v. Gaylord Container Corp.*, 97-0688 (La. 12/02/97), 704 So.2d 1161, for the proposition that a claimant can establish a prima face case of entitlement to SEB for an occupational illness by noting his age, his limited education and specialized work history, his restrictions from working in his previous employment, and the fact that he earned more than minimum wage. Mr. Adams alleges that there is no question that he established a prima facie case for entitlement to SEB for his occupational hearing loss because he is (1) sixty-five years old, (2) worked forty years with Georgia Gulf, (3) worked thirty-five years in a specialized job at Georgia Gulf, (4) had a noise restriction that prevented him from working in most, if not all, work environments at the plant, (5) had only a high school diploma, and (6) earned four times more than minimum wage. Mr. Adams argues that once he established a prima facie case on the principles set out in *Seal*, then the burden shifted to Georgia Gulf to establish available jobs within Mr. Adams' restrictions, in his geographic area, paying ninety percent or more of Mr. Adams' pre-injury wage. We agree.

The Louisiana Supreme Court addressed the standards for proving entitlement to SEB payments in *Clay v. Our Lady of Lourdes Regional Medical Center, Inc.*, 11-1797, p. 4 (La. 5/8/12), 93 So.3d 536, 538-39, as follows:

> The purpose of SEBs is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident. *Poissenot v. St. Bernard Parish Sheriff's Office,* 09-2793 (La. 1/9/11), 56 So.3d 170, 174; *Pinkins v. Cardinal Wholesale Supply, Inc.,* 619 So.2d

52, 55 (La.1993). La. R.S. 23:1221(3)(a) provides that an employee is entitled to receive SEBs if he sustains a work-related injury that results in his inability to earn 90% or more of his average pre-injury wage. Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. *Poissenot*, 56 So.3d at 174; *Banks v. Industrial Roofing & Sheet Metal Works, Inc.*, 96-2840 (La.7/1/97), 696 So.2d 551, 556. Once the employee's burden is met, the burden shifts to the employer who, in order to defeat the employee's claim for SEBs, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region. La. R.S. 23:1221(3)(c)(i); *Poissenot,* 56 So.3d at 174; *Banks,* 696 So.2d at 551.

It is also worth noting that this "analysis is necessarily a facts and circumstances one in which the court is mindful of the jurisprudential tenet that worker's compensation law is to be liberally construed in favor of coverage." *Daigle v. Sherwin-Williams Co.,* 545 So.2d 1005, 1007 (La.1989). In *Seal*, the claimant, Mr. Silmon Seal, received SEB payments for an occupational illness based on his long-term exposure to chemical vapors while employed at a paper mill. In finding that Mr. Seal had indeed met his burden proving a prima facie case of entitlement to SEB, the Louisiana Supreme Court held:

> The medical and lay testimony established that Seal could not return to his former job as a bogol operator—a job at which he was able to earn $17.36 per hour, more than three times the minimum wage. In his testimony, Seal concedes that he is able to earn minimum wage, and the hearing officer's award of SEBs reflects this concession. In addition, we find that Seal's age, limited education, and specialized work history are additional factors that mitigate in favor of the hearing officer's conclusion that Seal is unable to earn ninety percent (90%) or more of his pre-injury wages. Thus, we conclude that because there was sufficient evidence in the record, the court of appeal erred [in] its determination that the hearing officer's findings on this issue were manifestly erroneous.

*Seal*, 704 So.2d at 1166-67. Similarly, we find that the record in this case supports the WCJ's finding that Mr. Adams established a prima facie case for entitlement to SEB for his occupational hearing loss because, like Mr. Seal, Mr. Adams only had a high school diploma, had been working at the plant for the past forty years, was sixty-five years old, had a work restriction that prevented him from working in most work environments at Georgia Gulf, and was making four times minimum wage at the time of his occupational illness.

Because we find Mr. Adams satisfied his initial burden of proving entitlement to SEB payments, we now consider whether Georgia Gulf carried its burden of proving that there were jobs available to Mr. Adams within his work restrictions and that paid him ninety percent of his pre-injury wages.

In *Banks*, 696 So.2d at 557, the Louisiana Supreme Court set forth the minimum standard that an employer must meet in order to discharge its burden of proving job availability:

> (1) the existence of a suitable job within claimant's physical capabilities and within claimant's or the employer's community or reasonable geographic region;
>
> (2) the amount of wages that an employee with claimant's experience and training can be expected to earn in that job; and
>
> (3) an actual position available for that particular job at the time that the claimant received notification of the job's existence.

The court defined "suitable job" as "a job that claimant is not only physically capable of performing, but one that also falls within the limits of claimant's age, experience, and education, unless, of course, the employer or potential employer is willing to provide any additional necessary training or education." *Id.*

14

Ben Phelps, the claims adjuster for Liberty Mutual,[1] testified that no effort was made by Georgia Gulf to offer Mr. Adams any job which fit within his work restrictions. Specifically, Mr. Phelps testified as follows:

> Q. Well, my point is: You knew that he [Mr. Adams] was seeking SEB benefits. Did you know that, in Louisiana, one way to avoid having to pay SEB benefits would be to offer him a job that pays 90 percent or better of his wages back when he was working at Georgia Gulf?
>
> A. Correct.
>
> Q. Okay. And all I'm saying is: To keep from having to pay these SEB benefits, did you talk to Georgia Gulf about offering such a job?
>
> A. We did not. We had - - no, we did not.
>
> Q. Okay. Well - - and since you didn't offer him the job, can you explain to the Court why you didn't start his SEB benefits at that point?
>
> A. At that time we had - - since we had forwarded the records to Dr. Dobie from Dr. Breen, his position was still that the hearing loss was not occupationally related; and as such, you know, we felt that it wasn't reasonable to begin based on that opinion.
>
> Q. And where was that opinion coming from? I mean, I saw a report from Dr. Dobie. He didn't render a report until October.
>
> A. We had spoken with him telephonically as well as - -you know, basically it was telephonically that we had spoken with him, and I believe there was some drafted reports before then. I couldn't speak to the date, though.
>
> Q But you knew that Dr. Dobie had never spoken to Mr. Adams or examined him, right?
>
> A. Correct.
>
> Q. You do know that in a workers' compensation claim, you are supposed to start benefits and pay them until such time as you have a sufficient basis to

---

[1] Liberty Mutual provided Georgia Gulf with workers' compensation coverage at the time of these proceedings.

controvert the claim, to reasonably controvert the claim; correct?

A.   Correct.

After applying the minimum standard as enunciated above, we find the record void of any evidence offered by Georgia Gulf to carry its burden of establishing the availability of any job for Mr. Adams other than the job he had held for the last thirty-five years, which he is now medically restricted from performing.   As such, we find no manifest error in the WCJ's judgment that awarded Mr. Adams' SEB payments.

**Retirement and SEB payments**

Although we find that the WCJ properly awarded SEB payments to Mr. Adams, we find it was error for the court to order Georgia Gulf to continue to pay "this rate until it either finds or offers a job to Claimant paying at least 90% of his AWW [average weekly wage]."   At the time Mr. Adams was diagnosed with occupational hearing loss, he was over sixty-five years old and had retired from Georgia Gulf.   In addressing retirement and SEB benefits, the court in *Breaux v. City of New Orleans*, 97-273, pp. 6-7 (La.App. 4 Cir. 8/27/97), 699 So.2d 482, 486, *writ denied*, 97-2491 (La. 12/19/97), 706 So.2d 454 (internal citations and quotation marks omitted), stated as follows:

> Retirement occurs[,] for purposes of SEB entitlement[,] when the worker either withdraws from the work force or draws old age social security benefits, whichever comes first.   Determination of whether an employee has withdrawn from the work force for purposes of SEB is based on many factors, including age; the circumstances of each case control.   Generally, an employee who elects retirement benefits in lieu of returning to work is considered to have retired.   This rule also applies if the employee states his intention to not look for another job despite his doctor's opinion he could return to sedentary work.

Under the provisions of La.R.S. 23:1221(3)(d)(iii), "[w]hen the employee retires . . . the period during which supplemental earnings benefits may be payable shall not be less than one hundred four weeks." Because the record supports the fact that Mr. Adams has not sought employment since his retirement in June 2011, and that he now considers himself retired, we amend the WCJ's judgment to limit Mr. Adams' SEB payments to 104 weeks.

*Penalties and Attorney fees*

The last issue to address is whether the WCJ erred in awarding Mr. Adams penalties and attorney fees. Georgia Gulf argues that it appropriately investigated this claim and relied upon substantial expert medical evidence confirming that Mr. Adams' hearing loss is not compensable. Mr. Adams alleges that the WCJ properly awarded penalties and attorney fees for Georgia Gulf's arbitrary and capricious complete denial of benefits notwithstanding Mr. Adams' demand for benefits that was supported by his treating physician, Dr. Breen.

Louisiana Revised Statutes 23:1201(F) governs the assessment of penalties and award of attorney fees for an employer's failure to pay benefits. Louisiana Revised Statutes 23:1201(F)(2) provides that Subsection (F) is inapplicable if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer had no control. "Thus, to determine whether the claimant's right has been reasonably controverted, . . . a court must ascertain whether the employer or his insurer engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant." *Brown v. Texas-LA Cartage, Inc.,* 98-1063, p. 9 (La. 12/1/98), 721 So.2d 885, 890.

"The determination of whether an employer or insurer should be cast with penalties and attorney fees in a workers' compensation action is essentially a

question of fact." *Authement v. Shappert Eng'g*, 02-1631, p. 12 (La. 2/25/03), 840 So.2d 1181, 1188. This court has consistently held that in order "[t]o avoid penalties and attorney[']s fees for the nonpayment of benefits, the employer or insurer is under a continuing duty to investigate, to assemble, and to assess factual information before denying benefits." *George v. Guillory* 00-591, p. 13 (La.App. 3 Cir. 11/2/00), 776 So.2d 1200, 1209, *overruled on other grounds by Smith v. Quarles Drilling Co.,* 04-179 (La. 10/29/04), 885 So.2d 562.

After reviewing the record, especially the testimony of Mr. Phelps that he did not initially investigate the claim per Georgia Gulf's request, we find no manifest error in the WCJ's finding that the "insurer [Liberty Mutual], although following the employer's instruction, both clearly failed to controvert this case and was arbitrary and capricious in handling the same." Accordingly, we affirm the court's award of $8,000.00 in penalties and $25,000.00 in attorney fees.

Mr. Adams' answer to the appeal seeks additional attorney fees for the appeal work done on this case. Because attorney fees were correctly awarded by the trial court, failing to award increased attorney fees for the additional work required for this appeal would be inconsistent with that judgment, especially considering the fact that Mr. Adams' attorney presented two oral arguments before this court and filed an appellee brief and a supplemental brief on the issues. Accordingly, we conclude that Mr. Adams is entitled to an award of $5,000.00 in attorney fees for additional work on appeal.

For the reasons set forth above, the judgment of the WCJ is amended to limit Mr. Adams' SEB payments to 104 weeks. In all other respects, the judgment is affirmed. Additionally, judgment is rendered in favor of Mr. Adams and against Georgia Gulf Lake Charles, LLC and Liberty Mutual Insurance Company, jointly, severally and in solido, in the amount of $5,000.00 in additional attorney fees for

18

the work necessitated by the present appeal. All costs of this appeal are assessed against defendants, Georgia Gulf Lake Charles, LLC and Liberty Mutual Insurance Company.

**JUDGMENT AMENDED AND, AS AMENDED, AFFIRMED.**

NUMBER 17-723

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

JOSEPH ADAMS

VERSUS

GEORGIA GULF LAKE CHARLES, LLC, ET AL.

**EZELL, Judge, dissenting.**

The majority opinion finds that the workers' compensation judge was correct in determining that Mr. Adams is entitled to SEB. I respectfully dissent and would reverse the judgment of the trial court for the following reasons.

Mr. Adams was employed by Georgia Gulf beginning in 1971. He worked several labor positions at different locations at Georgia Gulf's facility, doing work ranging from construction, to being a boilermaker, and crane operation during his almost forty years at Georgia Gulf, to name a few. Mr. Adams claims he began to notice some degree of hearing loss during his employment, though by his own admission, it never affected his work. In January 2010, at age sixty-five, Mr. Adams had back surgery. His back problems were not work related, and he used accumulated vacation time during his recovery. During this time, Mr. Adams decided to retire. His retirement became official in January of 2011. In June of 2015, Mr. Adams filed the current workers' compensation claim, seeking SEB as a result of his alleged hearing loss.

> "The purpose of [SEBs] is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident." *Banks v. Industrial Roofing Sheet Metal Works, Inc.*, 96–2840 (La.7/1/97), 696 So.2d 551, 556. An employee is entitled to receive SEBs if he sustains a work-related injury that results in his inability to earn ninety percent (90%) or more of his average pre-injury wage. La. R.S. 23:1221(3)(a). Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted

in his inability to earn that amount under the facts and circumstances of the individual case. *Banks*, *supra* at 556. "In determining if an injured employee has made out a prima facie case of entitlement to [SEBs], the trial court may and should take into account all those factors which might bear on an employee's ability to earn a wage." *Daigle v. Sherwin-Williams Co.*, 545 So.2d 1005, 1009 (La.1989) (quoting *Gaspard v. St. Paul Fire and Marine Ins. Co.*, 483 So.2d 1037, 1039 (La.App. 3 Cir.1985)). It is only when the employee overcomes this initial step that the burden shifts to the employer to prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employee's community or reasonable geographic location. La. R.S. 23:1221(3)(c)(i); *Banks*, *supra* at 556; *Daigle*, *supra* at 1009.

*Poissenot v. St. Bernard Parish Sheriff's Office*, 09-2793, pp. 4-5 (La. 1/9/11), 56 So.3d 170, 174 (alterations in original) (footnote omitted).

"In determining whether a [workers' compensation judge's] finding that an employee has met his initial burden of proving entitlement to SEBs is manifestly erroneous, a reviewing court must examine the record for *all* evidence that bears upon the employee's inability to earn 90% or more of his pre-injury wages." *Seal v. Gaylord Container Corp.*, 97-688, p. 8 (La. 12/2/97), 704 So.2d 1161, 1166.

Retirement occurs for purposes of SEB entitlement when the worker "withdraws from the work force." *Allen v. City of Shreveport*, 93-2928, p. 9 (La. 5/23/94), 637 So.2d 123, 127. "An employee who chooses pension benefits as opposed to returning to work has retired." *Randazzo v. Boh Bros. Constr. Co.*, 01-1953, p. 5 (La.App. 4 Cir. 3/27/02), 814 So.2d 671, 675, *writ denied,* 02-1162 (La. 6/14/02), 818 So.2d 783. "Moreover, an employee who expresses his intention to both retire, or stop working, and not look for other employment and who makes no effort to find another job has retired within the meaning of LSA-R.S. 23:1221." *Id.*

Determination of whether an employee has withdrawn from the work force for purposes of SEB is based on many factors, including age; the circumstances of each case control. *Mason v. Auto Convoy*, 27,444 (La.App. 2 Cir. 11/1/95), 662

2

So.2d 843, writ denied, 95-2905 (La. 2/2/96), 666 So.2d 1103.  The "retirement" which restricts SEB payments is that based upon age or years of service, resulting in some type of pension, and does not refer to unemployment as a result of an employment-related injury.  *Margin v. Barthelemy*, 93-2224 (La.App. 4 Cir. 5/17/94), 638 So.2d 291, *writ denied*, 94-2172 (La. 11/18/94), 646 So.So.2d 378.

I agree with the majority that the workers' compensation judge has laid out thorough and compelling reasons for judgment explaining her findings as to the extent and causation of Mr. Adams's hearing loss.  The findings as to those issues were reasonably supported by the record.  However, I note that the workers' compensation judge's reasons made no mention whatsoever as to Mr. Adams's wage earning capacity, which is a crucial component of an SEB award.  In my view, the record shows that Mr. Adams failed to meet his burden of proving, by a preponderance of the evidence, that his hearing loss resulted in an inability to earn ninety percent or more of his average pre-injury wage under the facts and circumstances of the individual case.

Plainly put, it is my view that the record was devoid of any type of evidence concerning Mr. Adams's earning capacity, other than the fact that he desires an earning capacity of zero.  While the record shows that Mr. Adams held several positions and acquired a large and diverse skill set during his forty years of work at Georgia Gulf, there was no evidence in the record to show that this skill set could not be put to use in a quieter facility, had Mr. Adams actually desired to do so.  There is no testimony or affidavit from any vocation rehabilitation expert concerning Mr. Adams' potential earning capacity.  While Mr. Adams testified that he earned roughly $50,000 in his final years at Georgia Gulf,[1] nothing in the record

---

[1] Mr. Adams had earned more in prior years, when he had worked frequent overtime.  Mr. Adams testified he reduced those hours as he got older.

shows that he is unable to earn ninety percent of that amount using his skills in quieter employment.[2] To the contrary, the record shows that Mr. Adams had no desire to use his skill set for employment at all. The only evidence regarding Mr. Adams's earning capacity whatsoever indicates that he voluntarily left the workforce in 2010 for reasons *completely unrelated* to his hearing loss.

The evidence presented at trial shows that Mr. Adams did not leave work due to any reduction in his hearing, but that he simply chose to retire due to his age and his back. Mr. Adams' hearing loss was in no way a factor in his decision to retire, nor did it affect his ability to do his job, by his own admission. When he retired, Mr. Adams had no doctor preventing him from working or limiting his employment due to his hearing loss. In fact, Mr. Adams did not receive any type of employment limitations from a doctor due to his hearing until *five years after* he last worked at Georgia Gulf. Moreover, Mr. Adams testified that he had no desire to return to the work force after he retired, and that he had not sought any employment, of any kind, in the five years between his retirement and the trial. While he may have initially intended to work until the age of seventy, Mr. Adams himself made it perfectly clear that once he had stopped working due to his unrelated back surgery in 2010, he decided to completely leave the workforce. He stated that, after eight or nine months off work after the surgery, he "got to the age, [he] didn't want to go back, so [he] retired."

As noted above, the purpose of SEB is to compensate the injured employee for the wage earning capacity he has lost as *a result of his work injury*. *Banks*, 696 So.2d 551. It is my view that the record shows Mr. Adams has not lost any earning capacity due to his hearing loss. Because Mr. Adams had so obviously voluntarily

---

[2] Mr. Adams claims that "common sense" suggests that he could not earn ninety percent of his past wages. However, vague assertions of common sense are not, in fact, evidence.

retired, *for reasons completely unrelated to his hearing loss*, and because he had been retired for so long prior to trial, he has not and did not lose *any* wage earning capacity, let alone lose any such capacity *due to his work injury*. As such, I feel that the workers' compensation judge had no reasonable basis for its finding that Mr. Adams lost any portion of his wage earning capacity. Accordingly, I would find that he has failed to establish that he is entitled to SEB and would reverse the decision granting them.

Based on my view of the decision regarding SEB, I would also find that the workers' compensation judge erred in awarding Mr. Adams penalties and attorney fees.